Conner Bros is a family-owned construction company that's been doing business for 30 years and all that time. They were working at Fort Benning in Georgia. This appeal involves the government's Sovereign Acts Affirmative Defense to a delay in suspension claim on a contract Conner had to build Ranger Regimental Headquarters for the U.S. Army Rangers at Fort Benning. Now, this Ranger Regimental Headquarters was part of a bigger complex that was being constructed for the Rangers. That included the Rangers Regimental Headquarters and a subordinate unit, the 3rd Battalion facilities there. At the time of the incident, the Battalion facilities had been occupied. That work had been completed and the Rangers had occupied them. On the morning of September 11, 2001, after the attacks, General Votel, who's the Rangers Regimental Commander, ordered that Conner Bros, who was performing the work on his new headquarters, be shut down. That shutdown lasted 41 days. Conner was finally allowed to go back to work and they had made a claim for a 35-day compensable delay. The primary issue in this court is whether or not General Votel's order was a sovereign act, whether it was public in general and therefore insulated the government from contractual responsibility. The Board of Contract Appeals found that the order was a sovereign act and they focused on the reasonableness of the act, the necessity of the act, the fact that the act was called for to support the Rangers' mission as they marshaled assets, mobilized forces, and prepared for deployment. Conner does not question whether or not the act was necessary or appropriate. We can assume and we should assume that General Votel's order was appropriate. But that doesn't address the specific question before this court, and that is whether or not that order was a sovereign act, whether it was public or general. How do we analyze the determination whether it's public or general? Is that a question of law or a question of fact? It is a question of law, Your Honor, based on the circumstances that gave rise to the order. The Supreme Court clearly understood that was a question of law in their Winstar decision. Now, one of the things that we need to be clear on, what is the act that this court is going to have to analyze? Because while the parties agree— Well, Winstar was not really a determination of whether it was a question of law or fact. The Winstar decision itself was really so split that you couldn't tell whether it should be analyzed as a question of law or fact. In my reply brief, I addressed that very question and cited a case, and right now I don't recall the case I cited. But that was an issue raised in the government's case. But clearly, whether it's public in general has got to be a question of law, considering what Winstar's plurality holding is. And their holding is, and I'm referring to page 899, 518 U.S. 899, the plurality held that a government act will not be public in general if it has a substantial effect of releasing the government from its contractual obligations. But that's only three justices, right? That's four justices, I believe, Your Honor. I thought it was three. But it's not a majority. It's not a majority, Your Honor. This court has essentially followed the plurality's ruling in the two cases I cite when they talk about a public in general act has got to be, it can't be public in general unless its impact on a contract is merely incidental or merely consequential. Suppose there were 12 contractors here who were all excluded from the base. Would that be a public in general act? Your Honor, on the day of... No, no. Answer my hypothetical. If there were 12 contractors, hypothetically... If there were 12 contractors... If they were all excluded, would that be a public in general act? Your Honor, it depends on the person making the decision to take the action and what he was thinking about. Under Winstar, the holding, not only, the Supreme Court not only addresses the holding, it says how to implement the holding. And what it says is look at the attention given by the actor to the contracts and whether or not he was concerned about the contracts in question. And what the court says is the attention, and I'm paraphrasing, the attention given to the contracts prior to the act shows that a substantial effect on government contracts is certain. In Winstar, it had to do with legislation, banking... You didn't answer my question. There are 12 contracts here. And the order says no contractors can come on the base. Is that a public in general act? Same order, same concerns. What's the answer? If General Botel was aware of 12 contractors and one of the 12 contractors off the base, that would not be a public in general act. If he was aware of it, it's obvious that he's going to be aware of it. Suppose he says, we are not going to have anybody from the outside world, whether it's contractors, press, civilians for any purpose, are going to be on the base for the next month, period. He's aware that there are contractors there, but that's not the reason. He's not trying to get out of the contracts. He's simply trying to address a need for the base integrity, let's say, for a short period of time. Would that be a public act? Probably, yes. But even though he was quite aware that one of the people being excluded would be, it's still a public act, right? Your Honor, the facts here are different because generally. I know that's true. But in order to figure out how to fit the facts here into the matrix of public act law, we need to know at least what your position is with respect to what it is exactly that triggers the public act. That's why I'm as interested as Judge Dike in your answer to the, when we expand the scope, the effect of this determination of exclusivity, does it turn it into a public act, and if so, when? In this case, Your Honor, General Votel made issue two orders. Final effect 16 states, when he restricted access to mission essential personnel, General Votel took a further decision to deny access to Conner and his subcontractors. He testified that the decision to deny access to Conner and his subcontractors was separate and apart from the general implementation of access restrictions. He had issued an order to his battalion commanders, go to lockdown mission essential personnel only, and he allowed the battalion commanders to implement that order. Separate and apart from that, because Conner was building General Votel's own regimental headquarters, he says, remove the contractor building our facilities. It was a separate directive focused directly at Conner runners. Now that, under those circumstances, cannot be a sovereign act, because it was focused toward a specific contractor, performing a specific contract at a specific site. Well, that's good. Let me give you another hypothetical. Suppose instead of the emergency following 9-11, the commanding general had decided that the supervisor, the contract supervisor, had committed a criminal act and asked the local police to arrest that person with the consequence that the job was delayed, and he did that with knowledge of the contractor. Would that be a public and general act? Your Honor, I don't believe so, because there's a disconnect between the act and the impact on the contractor. We don't have such a disconnect here. What's the disconnect? The disconnect is his purpose is totally unrelated to the performance of the contractor. It is to pursue a criminal investigation or to pick up somebody. That's the disconnect. Here, General Votel, and the board here, spends a lot of time focusing on General Votel's specific concerns about this contractor being on this facility. They had mobility. They had visual access. There were too many people. He explains all this. His act, his directive, is focused on that particular person or that group of people and the need to get them off his complex to assist and help him avoid security issues. So he is focusing attention on this contractor, and that is why this is not a sovereign act, because there's not that disconnect that Winstar requires that this court has required when it talks about merely incidental, merely consequential. Once you understand that General Votel issued two orders, one exclusively related to this contractor because he specifically wanted him out, sovereign act analysis is very simple. It is not a public and general act. It's certainly appropriate. It was necessary, but it's a contractual act that entitles my client to compensation under the Changes in Suspension of Work Clause. If I can come back to my example, there are 12 contractors performing, but he excludes all of them. He knows about the contractors. Is that a public and general act? If he excludes all of them because he wants them off the site for security purposes, no, that's not a public and general act. He's stopping performance because he's focused on those contractors. Again, look at the Winstar decision because the Supreme Court, the plurality at least, focused on the congressional debates about that banking legislation and realized that those congressmen are focusing on these contracts. And once the Supreme Court recognized that the debate was over the impact of the contracts, it's no longer a public and general act. Well, now, I'm having a hard time seeing how your test squares with the Horowitz case. You remember Horowitz? It's the silk importation embargo. And the notion is suppose that there were 12 known importers of silk who were ruined by the congressional embargo and the congressmen perfectly well knew the consequence of the embargo. Horowitz lost. That's correct. Why isn't this like that? Because the decision to issue the embargo was totally unrelated to the performance of these contracts. What do you mean totally unrelated? It stopped the performance of the contracts. It incidentally stopped them. And it was for a different reason other than trying to get out from under the contracts. It was because of some foreign relations concerns. Here, there wasn't. Votel was not trying to somehow interfere with the contract, but he liked the contract. He was trying to serve a different public purpose, right? What's the difference between the two? Because he was focused on the performance of that particular contractor. He was aware of that contractor. He focused in. You look at the board decision, finding the fact 16, 19, and 20 focuses on what General Votel was concerned about concerning the specific contractor that's out there that he orders the shutdown for. Now, so if in Horowitz there were only one silk importer, it would be a different case? In Horowitz, that is a public and general act because that act had to do with the embargo of silk independent of any contracts that might be affected. Now, to the extent that that embargo was directed because of the performance of the contract, same as in Winstar. Winstar was not a public and general act. It was found because Congress was focusing on the contracts being affected. Horowitz, there was no focus on the contracts. They were focusing on the silk. That's the distinction. Now, on 9-11... He's not focusing on the contracts. He's focusing on the fact that the personnel had to be excluded from the base. On 9-11, the base, the fort commander, Fort Wye, Fort Benning, shut the fort down. Nobody could get on the fort. That's a public and general act. We don't dispute that. That shut down of the entire fort lasted 16 days, and it affected many, many, many personnel, people, contractors. That's a public and general act. However, General Votel's specific decision to send two armed guards to shut Conner Brothers down was focused on the performance of that contractor, and therefore, in doing so, it cannot be public and general. The board made its error, and we ask that this court reverse the board and send it back for purposes of quantum. Well, we'll save a couple of minutes for another few people. Thank you. Thank you, sir. Thank you. May it please the court, we respectfully request that the court affirm the decision of the Armed Services Board of Contractors. The board's decision was supported by substantial evidence and was not contrary to law or regulations, nor was it arbitrary or confucius. The Sovereign Acts Doctrine is part of every contract, whether specifically mentioned in the contract or not. As the board stated, determining whether an act of the government falls within the Sovereign Acts Doctrine requires an examination of the government's purpose for an application of the act. Does that make it into a question of fact, then, at that point? Yes, it is, Your Honor. Why do you need a question of fact? Because to determine whether a sovereign act exists, a court must look at the purpose for an application of the act to determine whether it is general and public in nature. Here, Conner concedes that the purpose of the act, or I quote from their brief, concedes that the goals behind the Exclusion Order were to enhance the Rangers' operational security, to allow it to pursue national policy objectives, and to allow the Rangers to use Conner's work to implement its mission. Conner concedes that these goals were certainly intended to further national interests, and that the directive never would have been issued had Conner not been performing in a location General Votel wanted to secure and thereafter use to prepare for deployment. Those are Conner's words on pages 25-26 of their brief. Thus, Conner concedes that the purpose of the Exclusion Order was for national interest. I'm going to determine if it's a question of law or fact. What are the basis for that determination? I'm still not sure what it is. Probably more a misquestion of law than fact. How do you decide and differentiate between the two? Well, here, Your Honor, both parties moved for summary judgment before the board. They cross-moved. The board held in an order in 2003, I believe, that the issues required a trial. The issues to determine whether the government's act was general and public in nature, and the purpose for the act and the applicability of the act were issues that had to be tried in this case. Now, it's possible that in a case such as Winstar, that required looking mostly at a government regulation and a contract to determine whether the regulation or the risk had been stated somehow, except for if the parties had accepted that risk in the contract. Perhaps that was more of a legal question, determining whether that was a sovereign act. Here, the board explicitly found that it wasn't possible to determine from the written record whether this was a sovereign act. The board wanted to hear from General Votel as to why certain contractors were allowed on the job site or the ranger compound, and certain contractors were not. The board wanted that fleshed out. So that was a question of fact, particularly in this case. I don't think anybody disputes that this was an authorized act for a public purpose. I mean, it wasn't both the bodies or General Votel. The question is, is it one of those unusual circumstances in which the government, having done something that interferes with the contractor's completion of the contract, nonetheless doesn't have to pay and the contractor has to bear the cost. So my question is, if this is... In a sense, we're somewhat influenced, I'm sure, by the fact that 9-11 is, of course, a spectacular event and has its sui genis in the creole. But the rangers respond on a fairly regular basis, if I understand it correctly, to emergencies around the world. So why isn't 9-11 just an extremely dramatic instance of something that could be expected to happen on a regular basis? And as such, why isn't this something that's very predictable, that it would happen and therefore not something that's so out of the ordinary that it could fairly be considered to fall into the diagram of possibility? Your Honor, that does go to Conor's argument about the impossibility defense. But that defense states that if the contract envisioned, if the letter of the contract envisioned that the impossibility would occur, that the act which rendered the performance of the government possible would occur, then the government cannot claim impossibility. In other words, it determines what the parties contracted to. If the contract as here did not envision delays or disruptions, in other words, Conor had 556 days to complete the performance, there was nothing in the contract that said, now there could be times when Conor can't perform because of a training exercise or the rangers do deploy occasionally, and in that instance, Conor may not be able to go on the job site. That was not envisioned in the contract. Your position would be much smaller. Because you would be able to say, look, you took this risk, that there would be times we have training exercises. Instead, there's nothing in the contract that says that Conor won't be able to continuously work. In fact, there's a provision that says the work to be performed is to be accomplished in facilities which would be unoccupied and vacant during the course of construction. So there's a representation to the contract. There is, which indicates that this shutdown of the ranger compound was not foreseeable. In other words, the impossibility defense says that if the contract foresees an event, you know, within the writing of the contract, and then the government uses that event later on to say, oh, sorry, we can't perform, the government cannot use that event because the parties foresaw that it could happen. Here it's the opposite. In other words, having promised that the circumstances, the unusual circumstances would not occur, then when they occur, the contract isn't breached. That promise is not breached. Well, yes, and particularly here. The board found that this was an unprecedented act, and there's nothing in the record to suggest that the government could have foreseen this and that it would have had to close the ranger compound for a period of time. Well, suppose that this had worked 9-11. Let's suppose this is the invasion of Panama, let's say, or the invasion of Puerto Negro. One of those other events that occur from time to time in which the rangers are involved. First, let's suppose on average once every four years, the rangers get sent to some place in which they have to engage in activities, as to which there's a need for security in advance of the deployment. Same result? In every single one of those cases, there would be, this would need to be a public act if the results of the deployment were that the contractors' activities were interfered with. Well, again, the board would have had to look at the purpose of the act and the applicability of the act. Same purpose as here. The same purpose. Same exact steps, except instead of going to Afghanistan, they went to Panama City. Same applicability. Your Honor, I can't tell what the board would have determined in different situations involving government and national defense, but here the board specifically found that this was unprecedented. And the applicability, we've already talked about the purpose of the act, and Conner concedes that the purpose was for national security. The applicability was general and public in nature as well, because Conner was part of the general public. Conner is the individuals making up Conner Company, and it's ten subcontractors and suppliers. So we do have at least 11 contractor companies, Your Honor, and that was one of your questions. Well, it strikes me that nobody really focused on the question of whether the 9-11 exclusion was something really unusual or whether it was the sort of thing that might happen every time the Rangers were about to be deployed somewhere. Right? I mean, there really isn't much evidence on the question that Bryson was asking about. Your Honor, Conner did point to one document in the record in support of its impossibility argument, and that was on page 160 in the appendix. And all that was was an e-mail that was in the government saying something about, is there a chance that the Ranger compound will be closed down for some reason or Conner won't have access to the site for some reason, and if that's the case, should that be part of the contract? There's no response to that e-mail. Conner didn't bring up anything else for that. In other words, that really went nowhere. And the contract itself makes no mention of possible closure of the compound. There's nothing in this. The contract's not entirely in the joint appendix. Maybe it's not even in the record before the court. It seems to me rather odd that there isn't a contract provision that deals with the question of the contractor's right to access to the base. I don't see that there's making an unoccupied line, which is really addressing the access to the base question. But there's nothing in this contract that addresses that. It seems to me quite odd. The access to the base you're asking? Yeah. I mean, you would think that if there's a contract, you know, you can't just walk into the base off the street. Isn't there anything in the contract that says the government will give access to the base to the contractor? Your Honor, I haven't seen that. But by virtue of it saying that the facilities would be available for Conner's use, that to me would imply that they would allow the contractor on a ranger compound, that somehow they would be able to get there. But Conner's objection to this general and public nature of the act goes solely to the fact that Conner was specifically told. In other words, ranger personnel went to Conner physically on 9-11 and said, you have to get off the ranger compound. I thought your response in brief to this line of questions that have been directed to you in the last two minutes was that they didn't raise the impossibility issue below, and that therefore the record is not complete on that, and that the board made no findings of that. Your Honor, we said they did not raise the issue below, which is correct. But we also noted that, regardless, the board addressed that issue and found that- Doesn't that mitigate against your argument that it was not raised below? It couldn't be raised? Well, whether the board's addressing it was in response to it being raised or not, Your Honor, the fact is the board addressed it. So which party raised it, I wasn't privy to the board proceedings. And the board doesn't indicate in its opinion who it's responding to, but it does address the essence of the impossibility defense. Where was that in the board's opinion? It was a finding of fact that terrorist attacks constituted an unprecedented emergency crisis situation. And that finding of fact, and I'll get the number for you, Your Honor, but that demonstrates that the parties did not envision the attacks and that the ranger deployment to Afghanistan and resulting closure of the compound. It seems to me to be somewhat short on possible evidence. You don't like the waiver argument, huh? The waiver argument? You're giving up on the waiver argument? No, we do not. That was in our brief. And I mentioned it just a minute ago in response to your question. Well, I would think your waiver argument would be stronger if, in fact, the board did not address the question. Once the board addresses the question, then that sort of leaves it open for further addressing by us, it would seem to me, if the board has put that issue into play. Well, again, to establish an impossibility defense, the act rendering performance impossible could not have been foreseen by the contract. So it would be the contract language, not what could have been in the contract, but what was in the contract, to see whether or not the parties envisioned that this act would occur. And here there's nothing in the contract that envisions 9-11, the resultant closure of the compound, deployment to Afghanistan, and only essential, mission-essential people allowed on the job. I guess what you characterize is this act that couldn't be foreseen. If you say 9-11, then you're probably right. If you say the deployment of the Rangers to a foreign assignment as to which security is needed and which the facilities are needed to prepare for the deployment, then it seems to me much more questionable as to whether that's not foreseeable. Well, here, Connor had to leave the job site, as did all non-mission-essential personnel. Connor was a subset of a larger group of non-mission-essential personnel. That is uncontradicted. They all had to leave the job site. I'm sorry, Your Honor? Cable people, the coke people. The coke and cable people, unfortunately, got on the job site, and that was contrary to the exclusion orders. That does not change the nature at the time of the exclusion order as being a public and general act. Again, Connor was a subset of a larger group, larger category of people deemed not mission-essential. The fact that they got a separate order to leave the job site was procedurally necessary to get them off the job site. They were the only contractor on the job site, so obviously they had to be told to leave the job site. Only because they got their own order does not mean that this was not a public and general act. It was. Even the contracting officer, a core employee, was not mission-essential. He couldn't go on the job site. So here it's very apparent that not only the purpose of the act in defense of national security, but the public and general applicability of it renders this a sovereign act, as the Board found. Could you point out whether the Board discussed the possibility of the term? It doesn't use that term, Your Honor. The Board does not use that term in its organization. Thank you, Your Honor. The cable and Coca-Cola contracts were allowed in because the battalion-level commander allowed it in. That was a separate direction, a separate order. General Botel ordered Conner off the complex, and again he ordered Conner to come back to the complex independent of what the battalion commander was doing. The case I was relying upon as far as this being a question of law is Orlando Helicopter v. Wendell. That cited the brief of 51F3258. That was a grant of summary judgment below on a sovereign act, and this Court reassessed or reevaluated that entire issue. I would like finally to have this Court at least consider an alternative remedy here, and that is under the duty to cooperate, and that is a constructive suspension. That under the facts and circumstances, the Corps of Engineers should have issued a suspension to Conner Brothers. The facts I rely upon is the early contract review by the Corps who acknowledged there could be an emergency that would cause a shutdown. It is in the appendix at page 160. It is a document. It is a contract review. There might be an emergency that would cause a shutdown. We need to tell the contractor something. Nothing was done. That's fact number one. Fact number two, in the contract it says that the contractor would be working in facilities that would be unoccupied and vacant. Fact number three, during the course of the job, Conner had been repeatedly interrupted by ranger activities, and that had formed the basis of a number of meetings and partnering meetings and suggestions. How can we keep the rangers out of our job site? How about a fence? There was an ongoing problem that was being worked out. At the time of 9-11, the Corps decided to do nothing. Under the circumstances, I believe under the Matusik decision, that there was an obligation for them to do something, and that would be to issue a suspension. What we have here is a possible constructive suspension. If the court were to go that way, then we'd have to address the Sovereign Acts issue. The relief would be the same. It would be under the suspension of work clause. Probably. It depends on the damages, which hasn't been resolved yet. Pretty much. I'm not going to say yes, I'm not going to say no. Thank you.